PER CURIAM.

■■■■

(No. 5848—Claimant ■■■■

GLORIA FUQUA KESSLER, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed May 15, 1974.*

LEWIS, BLICKHAN & GARRISON, Attorney for Claimant.

WILLIAM J. SCOTT, Attorney General; WILLIAM E. WEBBER, Assistant Attorney General, for Respondent.

BURKS, J.

This action was brought to recover damages allegedly caused by negligence of the respondent in failing to maintain the surface of a highway bridge in a safe condition or to warn the claimant of the unsafe condition of the bridge surface when covered with ice or frost.

The bridge, on which claimant's accident occurred, spans the Illinois River on U.S. Route 67 near Beardstown, some 45 miles northwest of Springfield.

This particular bridge, according to the record and photo exhibits, had a steel mesh or grid type of surface which is not commonly found in Illinois or at least in that section. Virgil Roberts, a section maintenance supervisor with the Division of Highways, testified that all of the other bridges in his jurisdiction are surfaced with either blacktop or concrete and that, to his knowledge, this was the only bridge in the entire area of west central Illinois that has this steel mesh type of surface construction.

Beverly Johnson, the State Police Trooper who investigated claimant's accident at the scene a few minutes after it occurred, described the surface of the bridge as having been covered with cement at one time. However, the cement topping had been removed or flaked away leaving the steel mesh exposed on the surface and the rough concrete filling the the square openings in the mesh was lower than the mesh itself. Trooper Johnson identified claimant's photo exhibit as an accurate image of the bridge surface at the time of claimant's accident. James Carl Sellers, a highway maintenance supervisor for District 6, said that this type of surface had existed on the Beardstown Bridge for quite some time prior to claimant's accident.

Continuing with the facts which we find to be supported by the evidence, it appears that on November 24,

1969, at approximately 6:45 a.m., claimant was driving her 1960 Chevrolet southbound on Route 67 from her home in Rushville to her place of employment in Springfield.

It was a cold, frosty and foggy morning, but the pavement from Rushville to the Beardstown Bridge was clear and dry. There was no appearance of ice or snow on the highway. Unknown to the claimant, the bridge was covered with ice which caused very slick driving conditions on the bridge. Claimant was in no particular hurry that morning and had slowed down by reason of a flashing light at the intersection a short distance from her approach to the bridge. When claimant drove onto the bridge her car slid into the railing on the right hand side, then slid over into the northbound lane and collided with a semi-trailer. Claimant's car was demolished and she suffered some severe injuries. She was unconscious for some time after the collision and does not recall exactly what happened on the bridge. Trooper Johnson could not talk to the claimant in her condition, and based his determination as to how her car skidded upon the eye-witness statement of a Mr. Kessler, the driver of the truck with which claimant collided.

Trooper Johnson also confirmed that, although the highway was clear and dry, the bridge surface was covered with a sheet of ice so slippery he could hardly stand up when he walked upon it. Trooper Johnson said he knew that this bridge got slick before the highway did, which he said is a natural thing; that he knew it was customary to salt this bridge on many occasions in freezing weather; but that the bridge had not been salted on this morning prior to claimant's accident. In describing the position of claimant's car and the truck when he arrived at the scene, Trooper Johnson said claimant's car

had turned completely around, in the opposite lane, and had been struck in the rear by the semi trailer. He said it took the truck a long distance to stop after colliding with claimant's car. The Trooper said that when he drove slowly onto the bridge, he could tell from driving on it that it was very slippery.

Respondent correctly states the well established rule that, before claimant can recover damages for her injuries, she must show by a preponderance of the evidence that [1] the State was negligent; [2] that she was free from contributory negligence; and [3] that the negligence of the State was the proximate cause of her injuries. Respondent contends that these three elements were not proven by the evidence introduced and that, therefore, this claim should be denied.

We believe that a careful examination of the facts warrants our finding that the preponderance of the evidence decisively supports claimant's contention on all three essential elements of proof required to sustain her claim. As we analyze the facts on which we base our conclusion, we will refer particularly to our decision in *Bovey v. State*, 22C.C.R. 95 in which we held the respondent liable for damages on facts that are quite similar to the case at bar. Although respondent undertakes to distinguish the *Bovey* case on comparatively minor points, we find the basic facts in *Bovey* to be so strikingly similar to the facts in the claim before us that, it seems to us, the *Bovey* decision is directly in point on the key issues involved here.

In the *Bovey* case, the claimant's accident occurred on a similarly constructed bridge which spans the Rock River near Dixon. That bridge, similar to the Beardstown bridge, had a steel grid floor with rectangular openings, which, as respondent knew, was subject to becoming icy

and slick on occasions when the approaching highway was dry and free from ice or snow. These facts are exactly the same as the case at bar. It is true, as respondent points out, that the bridge in *Bovey* had a defect in the alignment of the steel grid sections which caused some weaving and side swaying motion when the surface was dry. However, it was the ice on the bridge, and not the misalignment of sections, which caused claimant's accident in the *Bovey* case as it was in the case at bar.

There is one distinction which makes the authority of *Bovey* more favorable to the claimant in the instant claim. The bridge in *Bovey* had a large warning sign at its approach which read, "Bridge Slippery When Wet— Frosty". Since there was no frost on the roadway or countryside and the highway was dry, we held that this sign was ineffective as a warning that the bridge might be icy when there was no frost, ice or snow visible elsewhere.

Such a sign, had there been one in the case at bar, might have been regarded as an adequate warning to the claimant since the countryside was covered with frost even though the highway was dry.

Such evidence as we find in the record on this point indicates that there was no sign or device of any kind to warn the claimant of the quick freezing propensity of the steel grid surface of the bridge, or, for that matter, of any other hazard on the bridge. Claimant's photo exhibit showing a view of the bridge from the direction of her approach reveals no warning signs or devices. Since claimant alleged in her complaint that respondent was negligent in failing to warn her of any dangerous condition on the bridge, it would have been an affirmative defense to this allegation if respondent had been able to show that there were any such warning signs. Yet, the

respondent clearly avoided this question in both direct and cross examination of the witnesses which include 4 state employees who were all very familiar with this bridge and the freezing qualities of the steel grid surface. The 4 state employees who failed to mention any warning signs when they testified at the hearing were: Beverly Johnson, State police trooper; Virgil Roberts and James Sellers, both State highway maintenance supervisors; and Neil Morton, State traffic engineer in this district. This court said in *Tyler v. State*, 26 C.C.R. 231 at page 242:

"The State of Illinois owes a duty to the traveling public to maintain adequate and proper warning signs or devices alerting the public to the unusual and dangerous conditions ahead."

Inferentially conceding that the state failed in its study to maintain any warning signs at the bridge, respondent argues that such signs were unnecessary in claimant's case since she had crossed this bridge many times before and should have known what to expect. In support of this contention, respondent relies on *Pulizzano v. State*, 22 C.C.R. 234 in which we said at page 244:

"Warning signs only serve to notify persons of an existing danger. If the danger is shown, a warning sign is useless."

The *Pulizzano* case, from which the above statement is lifted, involves a claimant who fell from a dangerous trail in the black darkness of midnight in a state park, and the claimant there knew the trail was dangerous before the accident occurred. These facts bear no similarity to the case at bar. However, we have considered the question as to whether claimant, even in the absence of warning signs, should have known of the dangerous condition of the bridge on the morning of her accident.

Claimant testified that she had crossed this bridge many times, including some occasions when it was cov-

ered with ice while the pavements were dry. However, she also testified that on such occasions the bridge had been salted. Even if claimant was presumed to know that this bridge became ice in very cold weather when the pavement is dry, she was accustomed to finding the bridge salted when it was icy. Respondent's failure to salt the bridge or to warn of the danger on this particular morning, in our judgment, presented a hazard that could accurately be described as a trap for the traveling public. The dangerous condition of the bridge was certainly not readily foreseeable by the claimant.

We take judicial notice of the fact that, as we said in *Bovey*, "It is not unusual for bridges to freeze in snowy, icy, and extremely cold weather, when the pavement is free from ice or snow. This condition occurs, because the ground temperature imparts a warmth to the pavement, while the bridge floor obtains no such warmth".

There is ample testimony in the record that respondent had known for some time that ice would form on this particular bridge in freezing weather when the highway was totally dry, and there was no ice or snow elsewhere in the vicinity. Trooper Johnson said, after describing the construction of the bridge floor, "This [ice on the bridge when the other pavement was dry] is a natural thing". Notwithstanding this knowledge, the policy of the respondent, prior to the date of claimant's accident, was to salt the bridge only after being informed of the dangerous condition. In fact, the respondent made no attempt to check the bridge for ice, but would wait until someone called to notify the maintenance men of ice on the bridge before they would proceed to apply salt. The calls might come from the police, the sheriff, or someone else. Claimant was totally unaware of respondent's policy to salt the bridge only after someone phoned

to inform the highway department that the bridge was icy. It just happened that each time the claimant had previously crossed in ice conditions, salt had already been applied to the surface.

Over objections of respondent, Mr. Sellers, the state highway maintenance supervisor, testified that, immediately after claimant's accident, he personally instituted a new policy for salting this bridge. Under Sellers' new policy, the maintenance employees start to work at 4:00 a.m. rather than 8:00 a.m.; they check this bridge every day rather than wait for someone to call; this schedule includes holidays and weekends unless the weather is warm; and when they find icy conditions, they salt or cinder the bridge.

We have noted respondent's proper objection to any evidence as to changes in procedures which were made after claimant's accident, and the court does not regard such evidence as an implied admission that respondent was guilty of negligence in its prior procedures which caused claimant's injury. We find the record on this point conclusive without the necessity of any implied admission by the respondent. We consider the above testimony of Mr. Sellers admissible under the rule of evidence stated in *Kuhn v. I.C.R.R. Co.*, 111 Ill.App.323 at page 329, and restated in our *Bovey* decision at page 101, but only as prologue to his testimony as to conditions existing prior to claimant's accident.

Sellers said that when he took over as supervisor, some 8 months prior to claimant's accident, he was experienced in general road maintenance work but had no prior experience with a bridge surface of the type found on the Beardstown Bridge. Sellers further stated that the state had no written policies that covered his dispatching work crews for salting or cindering bridges. It is appar-

ent to the court that this failure on the part of the respondent, prior to claimant's accident, led Mr. Sellers, as he stated, to institute a policy of his own to make certain that the bridge was examined and salted when necessary under freezing conditions.

It is obvious from the record that, prior to claimant's accident, respondent's procedures in the maintenance of this bridge in freezing weather was incredibly negligent. There were no signs to warn of the danger of ice on the bridge which respondent knew existed in climatic conditions prevailing on the morning of claimant's accident. The bridge had not been salted or even inspected on that morning when respondent knew that the temperature was below freezing. Under the policy in effect at that time, respondent had no procedure for salting or inspecting the bridge until someone would phone in the information that the bridge was icy.

There is no evidence in the record on which the court could find the claimant guilty of contributory negligence. Claimant, who was unconscious after the impact of her collision with the truck, could not remember driving onto the bridge nor what she did immediately prior to the accident. However, she testified that she had slowed down for the intersection a short distance from the bridge and that she had been in no hurry to arrive at work that morning. This would be consistent with the time she had allowed herself to drive to Springfield. The accident was reported to the State Police at 7:00 a.m. She could have driven the 45 miles to Springfield at a low rate of speed and been there by 8:00 a.m..

The only eye witness to the accident was the truck driver who told Trooper Johnson that he just saw claimant's car start skidding and it skidded into his lane of traffic. Trooper Johnson found marks on the right hand

railing of the bridge which he thought was an indication that claimant's car struck this curbing first and then spun over into the opposite lane. Accepting this assumption, which was not confirmed by the eye witness, respondent theorizes in its brief that claimant may have lost control of her car after carelessly "driving into the curb". We consider it an incongruous conjecture to say that the icy condition did not cause the claimant to lose control of her car and strike the curbing, while admitting that the icy condition caused her car to skid into the opposite lane of traffic and turn completely around. We believe the only plausible explanation of this accident is that claimant's automobile skidded on the ice causing her to lose control and to strike the right hand side of the bridge, then skid on the ice into the northbound traffic lane. In the absence of any evidence to the contrary, we find that claimant was free from contributory negligence.

Bearing on the question of damages, the evidence establishes the following facts concerning the claimant, Mrs. Kessler, Prior to the accident she was in good health and had no injury or illness of any kind, according to her family physician. As a result of the accident, she suffered numerous injuries, some severe and permanant. She was hospitalized for three months in hospitals at Beardstown, Springfield and Rushville consecutively. Dr. Arthur G. Hyde, who attended the claimant immediately after her accident, wrote the following statement in a letter dated March 13, 1970, which was admitted into evidence and reads in pertinent part as follows:

"Gloria Fuqua Kessler was admitted to Schmitt Memorial Hospital in Beardstown on November 24, 1969, with multiple extreme injuries. Life support and maintenance systems were activated, and after several days of extremely "critical situation definitive evaluation of her injuries revealed fractures of the jaw, comminuted complicated fractures of the pelvis, simple fracture of the right radius, cranio cerebral trauma, and multiple lacerations

facial sutured. On December 3, 1969, under local anesthesia, fractures of the jaw were wired by my associate Doctor V. I. Machuca. The wiring proved to be unsatisfactory and was removed. On December 9, at the the request of the patient and her family, she was transferred to Memorial Hospital in Springfield, where she was under the care of Doctor Clifford J. Lynch."

The record contains two lengthy statements of Dr. Clifford J. Lynch, claimant's attending physician at the Springfield Hospital, which are consistent with the later testimony and prognosis of Dr. Russel R. Dohner, whose qualifications as a physician are impressive.

Claimant was under the care of Dr. Dohner after she was transferred by ambulance from the Springfield hospital to the Culbertson Memorial Hospital in Rushville, approximately one month after her accident. Claimant did not start walking again until one week after her discharge from the Rushville Hospital, about 3 months after her accident. She walked with the aid of crutches and then a cane and limped when she walked for about 4 months.

The record is replete with evidence of severe pain and suffering experienced by the claimant during her long period of recovery. Claimant testified at the hearing on November 18, 1971, that she still has frequent headaches; that her jaw catches as a result of the fracture, causing difficulty in eating; that she has scars on her right arm, on her face, hands and right foot; and that the rod in her right arm from wrist to elbow causes difficulty in using her right hand and slows her typing speed.

The most serious and permanent injuries suffered by the claimant were the multiple pelvic fractures which, according to Dr. Lynch, "have healed in a slightly displaced position". One hip is quite noticeably higher than the other.

Dr. Dohner explained in detail that claimant's badly

fractured pelvis would always cause her great difficulty in bearing children. He said that on January 26, 1971, a child was born to the claimant by Caesarean section because the risk of having a baby born through her badly injured pelvis was too great. In the future, Dr. Dohner said, "all of her babies will be delivered in the same way. She will have to have a section each time." Dr. Dohner also said, in response to respondent's questions, that the risk of injury or even death to both mother and baby is much greater with a Caesarean section than by a normal delivery; and that there is no reason to believe that claimant would not have had normal deliveries in childbirth if this accident had not occurred.

Respondent does not dispute any of the medical testimony as to the seriousness and permanency of claimant's injuries. Respondent merely points out that *§8D of the Court of Claims Act*, effective at the time of claimant's accident, places a limit of $25,000 on any award that may be made for damages in a case sounding in tort. Considering the expenses incurred by the claimant for medical services, which are well documented in the record, her pain and suffering, and the permanency of her serious injuries, we find that the maximum award should be made.

The claimant, Gloria Fuqua Kessler, is hereby awarded the sum of $25,000.00 as damages for her injuries and losses.